| | |
|---|---|
| STATE OF NORTH CAROLINA | IN THE GENERAL COURT OF JUSTICE |
| | SUPERIOR COURT DIVISION |
| COUNTY OF WAKE | FILE NO.: __ CVS _____ |

2021 JUN 15 A 11:34

KELSEA ANDERSON,

Plaintiff,

v.

CIRCLE K STORES INC.;
UNITED PARCEL SERVICE, INC.;
WENDY HUNTER;
HD CONSULTING SERVICES
GROUP, INC.;
HDGROUP, INC.; and
EMILY HUNTER MCGOWIN,

Defendants.

**COMPLAINT**
(Jury Trial Requested)

Plaintiff Kelsea Anderson, complaining of Defendants Circle K Stores Inc., United Parcel Service, Inc., Wendy Hunter, HD Consulting Services Group, Inc., HDGroup, Inc., and Emily Hunter McGowin, alleges as follows:

### PARTIES, JURISDICTION, AND VENUE

1. Plaintiff Kelsea Anderson is a citizen and resident of Wake County, North Carolina.

2. Defendant Circle K Stores Inc. ("Circle K") is a foreign corporation with its principal office in Tempe, Arizona. Pursuant to Rule 4, Circle K may be served with process via its Registered Agent at: Circle K Stores, Inc., c/o Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608.

3. At times relevant to the Complaint, Defendant Circle K maintained a registered office in Wake County, North Carolina and operated "Circle K"-branded combination convenience stores with gas stations in Wake County and throughout North Carolina, including one at the

1



location at 3721 Tryon Road in Raleigh which is the subject of this Complaint.

4. At times relevant to the Complaint, Defendant Circle K conducted its business in North Carolina pursuant to a Certificate of Authority issued by the North Carolina Secretary of State.

5. Defendant United Parcel Service, Inc. ("UPS") is a foreign corporation with its principal office in Atlanta, Georgia. Pursuant to Rule 4, UPS may be served with process via its Registered Agent at: United Parcel Service, Inc., c/o Corporation Service Company, 2626 Glenwood Avenue, Suite 550, Raleigh, NC 27608.

6. At times relevant to the Complaint, Defendant UPS maintained a registered office in Wake County, North Carolina and engaged in the business of parcel pickup and delivery in Wake County and throughout North Carolina, including at 3721 Tryon Road in Raleigh which is the subject of this Complaint.

7. At times relevant to the Complaint, Defendant UPS conducted its business in North Carolina pursuant to a Certificate of Authority issued by the North Carolina Secretary of State.

8. On information and belief, Wendy Hunter ("Hunter") is a citizen and resident of Adams County, Colorado, residing at her home at 8933 Wagner Street, Westminster, Colorado.

9. On information and belief, at all times relevant to this Complaint, Defendant Hunter was the sole proprietor or main partner in a business operating under the assumed name "Hunter Development Group," which she ran out of her home.

10. On information and belief, Defendant Hunter operated "Hunter Development Group" as a purported Texas corporation called "HD Consulting Services Group, Inc."

11. Defendant Hunter operated HD Consulting Services Group, Inc. in Colorado pursuant to a statement of foreign entity authority. According to records filed with the Colorado

2

Secretary of State, HD Consulting Services Group, Inc.'s principle office address is 8933 Wagner Street, Westminster, Colorado and Wendy Hunter is its registered agent. Additionally, according to filed records, HD Consulting Services Group, Inc. operates under the trade name "Hunter Development Group."

12. HD Consulting Services Group, Inc. forfeited its Certificate of Incorporate and its corporate existence on February 8, 2013, pursuant to Section 171.309 of the Texas Tax Code, and the forfeiture remains in effect.

13. Despite the forfeiture of HD Consulting Services Group, Inc.'s Certificate of Incorporate and its corporate existence on February 8, 2013, Defendant Hunter has continued to file periodic reports to the Colorado Secretary of State on behalf of the forfeited entity as if it remained in good standing in its jurisdiction of incorporation (e.g. Texas).

14. Under Colorado Revised Statute § 7-90-805, Texas law's determination that HD Consulting Services Group, Inc. has no corporate existence controls, and Defendant Hunter's apparent attempts to circumvent the forfeiture by not disclosing it to the Colorado Secretary of State fail.

15. On information and belief, Defendant Hunter was an officer or director of HD Consulting Services Group, Inc. before it forfeited its Certificate of Incorporate and corporate existence. As such, Defendant Hunter is personally liable as a partner for its subsequent debts under Texas Tax Code § 171.255, including all amounts owed to Plaintiff in the instant action for the actions and omissions of "Hunter Development Group."

16. In the alternative, if the Court should find that HD Consulting Services Group, Inc. has the capacity to be sued for the actions and omissions of "Hunter Development Group" as complained of herein, then Plaintiff has named it as a defendant.

3

17. On May 8, 2020, Melissa Balcerak, on information and belief a Senior Project Manager of "Hunter Development Group," filed Articles of Incorporation with the Colorado Secretary of State for a Colorado corporation called "HDGroup, Inc." having a principle office at 295 Luna Lane in Erie, Colorado, which on information and belief is Ms. Balcerak's home address.

18. On information and belief, "Hunter Development Group" has operated through and as HDGroup, Inc. since the date of its incorporation. On its website at http://www.hunterdevelopmentgroup.com, "Hunter Development Group" alternately refers to itself as "HDGroup."

19. Defendants Hunter, HD Consulting Services Group, Inc., and HDGroup, Inc. are sued collectively for the actions and omissions of "Hunter Development Group" as complained of herein, and are collectively referred to as the HDGroup Defendants.

20. At all times relevant to this Complaint, the HDGroup Defendants engaged in the business of building permit creation and submission and development consulting for private and corporate sector clients throughout the United States, including for clients and sites in North Carolina, under the name "Hunter Development Group." The HDGroup Defendants held themselves out as experts in obtaining governmental approvals for large or small-scale projects and able to oversee projects through the development review approval process to building permit issuance. As stated on their website:

> Our knowledgeable staff guides your project through the myriad of jurisdictional requirements. We streamline the process by coordinating and making all submittals, gathering and distributing all review comments, assuring compliance, and resubmitting documents.
>
> We can handle any commercial project, from freestanding structures, to in-line tenants.

21. At all times relevant to this Complaint, Defendant Emily Hunter McGowin

4

("McGowin") was an employee and agent of the HDGroup Defendants, for whom she worked as a project manager. On information and belief, Defendant McGowin is Defendant Hunter's daughter. McGowin may be served with process at 1540 Surrey Drive, Wheaton, IL 60189-7249.

22. Venue is proper in Wake County pursuant to N.C.G.S. §§ 1-79 and 1-82.

## FACTS

23. At all times relevant to this Complaint, Defendant Circle K operated a network of thousands of "Circle K"-branded combination convenience stores with gas stations throughout the United States, both directly through company-owned stores and indirectly through franchises.

24. At all times relevant to this Complaint, Defendant Circle K directly operated a company-owned "Circle K" branded convenience store and gas station at 3721 Tryon Road in Raleigh, North Carolina ("the Circle K location").

24. On information and belief, Defendant Circle K operated the Circle K location as a commercial tenant pursuant to a long-term renewable lease with landowner E F C Corporation (also known as "EFC Corporation").

25. On information and belief, as a long-term commercial tenant, Defendant Circle K exercised control over the Circle K location, including over site improvements made during its tenancy and at its direction.

26 At all times relevant to the Complaint, in addition to its nationwide enterprise of direct parcel delivery to homes and businesses, Defendant UPS operated a network of parcel pickup and delivery points called "UPS Access Point" at third-party locations such as convenience stores, including at the Circle K location.

27. Defendant UPS began adding specialized locker complexes for use by end customers for parcel pickup and delivery at select UPS Access Point locations. Generally, these

5

lockers were between 14 to 19 feet long and 7 to 8 feet tall, and were equipped with features including a touchscreen, barcode scanner, ID reader, and keypad. The lockers also generally had an awning with security cameras, LED lighting, and a pinhole camera allowing direct communication with UPS customer service.

28. On information and belief, at an unknown date before the incident complained of herein, Defendant Circle K entered into an agreement with Defendant UPS to allow the latter to install, operate, and maintain a pre-manufactured UPS Access Point locker complex at the Circle K location. On further information and belief, one reason Defendant Circle K allowed Defendant UPS to put a UPS Access Point locker complex the Circle K location was that it considered that some customers visiting the location for purposes of using the UPS Access Point locker complex would also buy gas or other goods from Circle K.

29. On information and belief, during 2017, Defendant McGowin, as employee and agent for the HDGroup Defendants, created and submitted multiple building permit applications in localities across the United States on behalf of Defendant UPS for the addition of UPS Access Point locker complexes.

30. On or about April 5, 2017, Defendant McGowin, as employee and agent for the HDGroup Defendants, in turn acting as an employee and agent for Defendant UPS and Defendant Circle K, created and submitted a building permit application to the City of Raleigh's Development Services Department in furtherance of the UPS Access Point locker complex project at the Circle K location. The building permit application is attached to this Complaint and incorporated herein as **Exhibit A**. Defendant McGowin signed the application as the agent of the property owner.

31. As stated in the building permit application, the project called for the pre-manufactured UPS Access Point lockers to be delivered, assembled, and attached to an existing

6

concrete pad at the exterior of the west side of the convenience store at the Circle K location. Installation was to take place against the existing building on the existing sidewalk.

32. As noted in the building permit application, a sidewalk already traversed the west side of the building, providing pedestrian access from the side parking lot to the store entrance and vice versa. On information and belief, the sidewalk was 5 feet wide and over 40 feet long. The sidewalk was elevated over the parking lot by several inches. An ordinary flat curb edge ran along the sidewalk, perpendicular to the parking lot. The curb edge was painted yellow.

33. The new locker complex was to extend along a 19-foot portion of the sidewalk along the building exterior. The locker complex was a few feet wide, meaning that existing sidewalk space would be reduced to only two feet of width along the 19-foot long section with the locker complex.

34. Because of this major reduction in sidewalk space, in order to create an accessible pedestrian path around and in front of the lockers, the building site permit called for a one foot wide concrete pad to be added to widen the affected portion of the sidewalk. This new concrete pad was to be level with the existing sidewalk and would extend along an approximately 28-foot span in front of the lockers. Sheet Number A3 of the building permit application depicts the plan as submitted.

35. Bollards were located between concrete parking stops in parking spaces and the sidewalk curb in the planned location for the new concrete pad. The building permit application called for the existing bollards to be removed.

36. The building permit application failed to disclose that a raised curb edge would be added to the concrete pad, as further described below.

37. On information and belief, Defendant McGowin, as employee and agent for the

7

HDGroup Defendants, Defendant UPS, and/or Defendant Circle K did not disclose the raised curb edge in the building permit application because it would have drawn attention to it as an unconventional and dangerous design feature unsafe for pedestrians as alleged herein. Such attention would have delayed the project by causing the feature to be noted and rejected by the City.

38. As a result of the building permit application, City of Raleigh issued a building permit for the project on May 5, 2017 (Permit #: 511844-431478-BL-139880). The work authorized was as follows (all capital letters in original): "INSTALL PRE-MANUFACTURED ACCESS POINT LOCKERS ON EXISTING CONCRETE PAD. LOCKER TO BE ON WEST SIDE OF BLDG. REMOVE BOLLARDS AND INSTALL CONCRETE PAD LEVEL WITH SIDEWALK FOR ACCESS TO LOCKERS."

38. On information and belief, at some point between the May 5, 2017 building permit issuance date, and June 8, 2017, the date in which the City of Raleigh issued a certificate of occupancy for the site, the UPS Access Point locker complex was installed and a one-foot wide concrete pad was added along an approximately 28 foot span in front of the lockers. The bollards in the location were moved outward by approximately a foot.

39. As alleged above, the addition contained a feature not disclosed in the building permit application or contained in the building permit: a raised curb edge coexisting with the previous, non-raised curb edge running along the sidewalk. The raised curb edge was located along section of the walkway containing the added concrete pad, while the non-raised curb edge was along the sidewalk not directly behind the added concrete pad. Like the existing sidewalk and the added concrete pad, the existing non-raised curb edge was elevated a few inches over the parking lot surface. The raised curb edge, however, was elevated several more inches over the

8

parking lot surface. The raised curb edge therefore had an extended rim which stuck up approximately three inches over the sidewalk surface, unlike the non-raised curb edge which was level and flush with the sidewalk surface. As a result, the newly added concrete pad was not level with the existing sidewalk, but protruded over it, contrary to the depiction in the building permit application, and contrary to the permitted work in the building permit itself.

40. Both the raised curb edge and the original non-raised curb edge were painted yellow. A photo depicting these curb edges from the parking lot is attached to this Complaint and incorporated herein as **Exhibit B.**

41. On information and belief, the raised curb edge was installed to facilitate Defendant UPS's operations by stopping wheeled UPS delivery dollies from rolling off the sidewalk onto to the parking lot during locker pickups and deliveries by UPS drivers. It functioned, in other words, as a catch.

42. Yet, by painting the raised curb edge yellow, the same color as the flush curb, defendants created hidden hazard and an unreasonably dangerous condition for visitors accessing the sidewalk from the parking lot, and vice versa:

    a. the section with the raised curb edge was closer to the parking lot than the section with the non-raised curb edge, decreasing the likelihood that a reasonable pedestrian in the parking lot would notice and appreciate a height difference, as closer objects naturally appear larger;

    b. the use of yellow paint on both the raised curb edge and the non-raised curb edge furthered the illusion that raised curb edge was a conventional unraised curb edge rather than an unexpected catch requiring special notice;

    c. the use of yellow paint on the raised curb edge prevented the hazard from

9

standing out from its environment, which included yellow painted parking stops in the parking spaces and yellow unraised curb edges;

    d.    the raised curb edge with an extended rim was a highly unusual, atypical design feature almost never encountered by pedestrians, as was the blending of a conventional, unraised curb edge with the raised curb edge, decreasing the likelihood that a reasonable pedestrian would discern that the feature was not an ordinary unraised curb edge like those universally, routinely, and safely encountered on a daily basis;

    e.    vehicles in the parking spaces obscured comparison of the non-raised curb edge portion of the sidewalk to the raised curb edge portion, decreasing the likelihood that a reasonable pedestrian in the parking lot would notice and appreciate that the raised curb edge portion was unconventionally and subtly raised above the sidewalk surface;

    f.    reasonable pedestrians exiting a sidewalk elevated over a parking lot surface are accustomed to stepping directly down off the sidewalk, not up over a raised curb edge and then down, and the raised curb edge defied learned behavior for reasonably walking on sidewalks and parking lots;

    g.    the extended rim of the raised curb edge was intended as a catch, and was tall enough to perform that function without being tall enough to be obvious to pedestrians or to present a noticeable or actual barrier to passage;

    h.    the extended rim of the raised curb edge's function as a catch for UPS's operations contradicted the intended use of the sidewalk and concrete pad as an accessible pathway to and from the parking lot for pedestrians.

43.    There were no warnings given of the raised curb edge or the hidden hazard it posed, through signage, appropriate or differentiated warning coloration or markings, or otherwise.

10

44. On information and belief, once it was completed, Defendant Circle K and Defendant UPS exercised possession and/or control over the UPS Access Point locker complex and the surrounding area, including the sidewalk, concrete pad, raised curb edges, and parking lot in the immediate vicinity.

45. All Defendants knew or should have known that reasonable lawful visitors to the Circle K location would park in the parking lot on the western side of the building and walk from the parking lot directly to the concrete pad and sidewalk, and vice versa, when accessing the convenience store, and would therefore have to pass over the raised curb edge while on foot.

46. All Defendants knew or should have known that reasonable lawful visitors to the Circle K location would purchase food and drinks in the convenience store for immediate consumption, and therefore pass over the raised curb edge while eating and/or drinking.

47. On July 4, 2018, at approximately 8:25 p.m.:

    a. Plaintiff was a lawful visitor to the Circle K location;

    b. Plaintiff parked in one of the parking spaces in the parking lot on the western side of the building;

    c. Plaintiff walked from the parking lot directly towards the concrete pad and sidewalk;

    d. The raised curb edge reasonably appeared to Plaintiff be a conventional, unraised curb edge, and nothing alerted her otherwise;

    e. Plaintiff stepped up from the parking lot onto the concrete pad and sidewalk;

    f. In stepping up from the parking lot, Plaintiff was reasonably unaware that she had cleared a raised curb edge rather than a conventional, unraised curb edge;

    g. Plaintiff walked along the sidewalk and into the convenience store;

11

h.  Plaintiff purchased an iced tea from the convenience store and began drinking it;

i.  Plaintiff walked along the sidewalk towards her parking space;

j.  Plaintiff, reasonably unaware of the raised curb edge, attempt to step down from the sidewalk and concrete pad onto the parking lot surface below;

k.  The extended rim of the raised curb edge caught Plaintiff's foot, causing her to trip and fall;

l.  Plaintiff immediately experienced great pain as her left ankle audibly dislocated and broke in the fall.

48. Wake County EMS responded to the scene. Upon arrival, paramedics noted that Plaintiff's left ankle had obvious dislocation and deformity from her injury.

49. EMS transported Plaintiff to WakeMed Cary hospital for emergency evaluation and treatment. During transport, Plaintiff required multiple doses of morphine for pain.

50. At WakeMed Cary, Plaintiff was diagnosed with a trimalleolar fracture and dislocation of her left ankle. Plaintiff underwent reduction and splinting in preparation for follow-up orthopedic surgery.

51. On July 18, 2018, Plaintiff underwent open reduction and internal fixation surgery on her left ankle fracture at Blue Ridge Surgical Center.

52. On July 25, 2018, Plaintiff underwent additional surgery at WakeMed Cary hospital to realign the hardware from the July 18, 2018 surgery.

53. On November 5, 2018, Plaintiff underwent a third surgery at WakeMed Cary hospital to remove painful hardware from the previous surgeries.

54. Plaintiff underwent physical therapy and other medical treatment as a result of her

12

injuries from the July 4, 2018 incident.

55. At all times relevant to this Complaint, Plaintiff was a public school teacher's assistant.

56. As a direct and proximate result of her injuries from the July 4, 2018 incident and her subsequent surgeries and recovery, Plaintiff was forced to miss work and incurred lost wages.

57. In addition, Plaintiff was enrolled at Wake Tech in a special program which would have enabled her to become a full salaried public schoolteacher via a certification rather than a four-year degree. Plaintiff's injuries and her subsequent surgeries and recovery forced Plaintiff to be unable to complete the program, causing loss of tuition and career opportunities.

## FIRST CLAIM OF RELIEF: PREMISES LIABILITY

58. Plaintiff restates the allegations in the above paragraphs and incorporates them herein by reference.

59. At all times relevant to this Complaint, Defendants Circle K and UPS owed Plaintiff a duty to use ordinary care to keep the UPS Access Point locker complex and the surrounding area at the Circle K location, including the sidewalk, concrete pad, raised curb edges, and parking lot in the immediate vicinity, in a reasonably safe condition for reasonable lawful visitors, including Plaintiff.

60. At all times relevant to this Complaint, Defendants Circle K and UPS owed Plaintiff a duty to give adequate warning of the hidden hazard and unreasonably dangerous condition caused by the raised curb edge with extended rim.

61. At all times relevant to this Complaint, Defendants Circle K and UPS owed Plaintiff a duty to implement a reasonable alternative design for the UPS Access Point locker complex and the surrounding area at the Circle K location which would have avoided placing a hard-to-notice

13

catch within an intended accessible pedestrian pathway.

62. At all times relevant to this Complaint, Defendants Circle K and UPS owed Plaintiff a duty to avoid unusual, unpermitted curb and walkway designs such as the raised curb edge which reasonably appeared to be an ordinary curb posing no hidden safety risk.

63. Prior to July 4, 2018, and on information and belief for at least a year before that date, Defendants Circle K and UPS created and/or had actual and constructive knowledge of the hidden hazard and unreasonably dangerous condition caused by the raised curb edge with extended rim and the lack of sufficient warning to reasonable pedestrians of the same.

64. Defendants Circle K and UPS each negligently breached their above duties to Plaintiff by maintaining the raised curb edge without adequate warnings and/or by failing to implement a reasonable alternative design that would have eliminated the danger posed by the extended rim.

65. The negligence of Defendants Circle K and UPS proximately caused Plaintiff to suffer serious injuries and other damages.

66. As a proximate result of the negligence of Defendants Circle K and UPS, Plaintiff sustained serious, painful, and permanent bodily injuries requiring hospitalization and medical treatment, including multiple surgeries. These injuries required Plaintiff to undergo medical treatment, physical therapy, and related measures, incur medical bills and expenses, lose wages and tuition payments, lose earnings capacity, have caused permanent disfigurement, scarring, and partial loss of use of body parts, and have caused and will cause physical and emotional pain and suffering and actual and special damages in an amount to be determined by the jury at trial, but in any event, an amount in excess of the minimum jurisdictional limits of this court.

67. As a direct and proximate result of the negligence of Defendants Circle K and UPS,

14

Plaintiff is entitled to recover of Defendants Circle K and UPS, jointly and severally, compensatory damages in an amount to be determined by the jury at trial, but in any event, an amount in excess of the minimum jurisdictional limits of this court.

## SECOND CLAIM OF RELIEF: NEGLIGENCE

68. Plaintiff restates the allegations in the above paragraphs and incorporates them herein by reference.

69. All Defendants had a duty to use reasonable care when creating and submitting the building permit application and to truthfully and accurately represent all material construction or design features of the project subject to permitting.

70. The raised curb edge materially altered the UPS Access Point locker complex's function, safety, accessibility, and design compared to the version portrayed in the building permit application submitted to the City of Raleigh's Development Services Department, and contradicted the representations in the submitted application that the planned concrete pad would be level with the existing sidewalk.

71. All Defendants had a duty to disclose the raised curb edge in the building permit application submitted to the City of Raleigh's Development Services Department. Similarly, all Defendants had a duty not to submit, or cause to be submitted, a building permit application inconsistent with the work that would actually be performed.

72. On information and belief, if Defendants had disclosed the raised curb edge in the building permit application, the City of Raleigh's Development Services Department would have rejected it as unsafe and not in compliance with applicable building codes and standards, and would have delayed the project until a safe design not containing that feature was resubmitted for approval.

15

73. By not disclosing the raised curb edge in the building permit application, all Defendants caused the City to be unaware of and not take note of the raised curb edge as a design feature in the construction performed at the UPS Access Point locker complex, and to approve the building permit and certificate of occupancy for the project despite the dangerous and unpermitted design feature.

74. Under Sec. 11.2.3 of the Raleigh, North Carolina Unified Development Ordinance, any failure by the City or its inspectors to notice and reject the raised curb edge, and any negligence by the City or its inspectors in issuing the building permit or certificate of occupancy for the project despite the raised curb edge's unpermitted inclusion in the final construction, does not legalize, waive, or excuse the negligence of Defendants as complained of herein or otherwise cause the raised curb edge to conform to applicable building codes and standards or other legal requirements.

75. It was reasonably foreseeable that all Defendants' failure to disclose the raised curb edge in the building permit application would cause the City to issue the permit and certificate of occupancy for the project contrary to the requirements of the North Carolina Building Code, the City of Raleigh's building codes and standards, and other applicable codes and standards, and thereby endanger lawful visitors to the Circle K location such as Plaintiff entitled to their protections.

76. At all times relevant herein, Defendant McGowin acted as an employee and agent of the HDGroup Defendants, within the course and scope of her employment and agency, and the HDGroup Defendants are vicariously liable for her actions under the doctrine of *respondeat superior*.

77. The negligence of all Defendants proximately caused Plaintiff to suffer serious injuries and other damages, as pled above.

78. As a proximate result of the negligence of all Defendants, Plaintiff sustained serious, painful, and permanent bodily injuries requiring hospitalization and medical treatment, including multiple surgeries. These injuries required Plaintiff to undergo medical treatment, physical therapy, and related measures, incur medical bills and expenses, lose wages and tuition payments, lose earnings capacity, have caused permanent disfigurement, scarring, and partial loss of use of body parts, and have caused and will cause physical and emotional pain and suffering and actual and special damages in an amount to be determined by the jury at trial, but in any event, an amount in excess of the minimum jurisdictional limits of this court.

79. As a direct and proximate result of the negligence of all Defendants, Plaintiff is entitled to recover of all Defendants, jointly and severally, compensatory damages in an amount to be determined by the jury at trial, but in any event, an amount in excess of the minimum jurisdictional limits of this court.

### JURY TRIAL DEMAND

**PLAINTIFF HEREBY DEMANDS A JURY TRIAL ON ALL ISSUES OF FACT SO TRIABLE.**

WHEREFORE, Plaintiff Kelsea Anderson, complaining of Defendants Circle K Stores Inc., United Parcel Service, Inc., Wendy Hunter, HD Consulting Services Group, Inc., HDGroup, Inc., and Emily Hunter McGowin, jointly and severally, as follows:

1. Compensatory damages in an amount to be determined by the jury at trial, but in any event, an amount in excess of the minimum jurisdictional limits of this court;

2. The costs of this action, including interest, as allowable by law;

3. Reasonable attorney's fees, to the extent allowable by law;

4. Such other and further relief as the Court deems just, fair, and equitable.

Respectfully submitted this 1st day of April, 2021.

LAW OFFICE OF D. HARDISON WOOD

By: /s/ D. Hardison Wood
D. Hardison Wood (NC Bar ID: 34909)
1400 Crescent Green Dr., Suite 140
Cary, NC 27518
Voice: 919-233-0520
Fax: 919-233-0521
dhw@hardisonwood.com
*Attorney for Plaintiff*

/s/ Jesse Rigsby / w/permission DHW
Jesse H. Rigsby, IV
N.C. State Bar No. 35538
jrigsby@bankslawfirm.com
The Banks Law Firm
P.O. Box 14350
Research Triangle Park, NC 27709
Telephone: (919) 474-9137
Fax: (919) 474-9537
*Attorneys for Plaintiff*

18